## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-2802

ADITYA PRAKASH, and
URMI BHATTACHERYYA,

      Plaintiffs,

v.

UNIVERSITY OF COLORADO, through the Regents of the University of Colorado, a body corporate;

      Defendant.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs Aditya Prakash and Urmi Bhattacheryya, through their counsel, Tyrone Glover and Helen Oh of TYRONE GLOVER LAW, respectfully alleges for their Complaint and Jury Demand:

### I. INTRODUCTION

1.     Plaintiffs Aditya Prakash and Urmi Bhattacheryya are international students from India who came to the United States on student visas to pursue doctoral degrees in cultural anthropology at the University of Colorado, Boulder.

2.     During their doctoral studies, Plaintiffs maintained exemplary academic records, with both achieving 4.0 grade point averages, consistently securing highly competitive research funding, and receiving praise from faculty for their scholarly contributions.

3.     After Mr. Prakash attempted to address an experience of racial and ethnic microaggressions by department staff, and after both Plaintiffs raised concerns about

discriminatory treatment, the University engaged in a pattern of escalating retaliation against them.

4.      This retaliation included the mass resignations of both Plaintiffs' advisory committees without warning or explanation, reassignment to advisors outside their subdisciplines who provided inadequate advisorship, the denial of promised credit transfers, poor performance feedback, downgrading of their student status, and ultimately the revocation of their doctoral funding.

5.      As a result of Defendants' violations of federal and state law, Plaintiffs have suffered and continue to suffer substantial economic, physical, mental, and emotional damages in violation of Title VI of the Civil Rights Act of 1964; the First Amendment of the United States Constitution; and Article II, Section 10 of the Colorado Constitution; and 42 U.S.C. § 1981.

## II.      JURISDICTION AND VENUE

6.      This action is brought under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; 42 U.S.C. § 1981 of the Civil Rights Act of 1866; the First Amendment of the United States Constitution; and Article II, Section 10 of the Colorado Constitution.

7.       Jurisdiction of this Court is invoked under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. This Court has jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

8.      Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-121.

9.      Venue is proper under 28 U.S.C. § 1391 because all the events or omissions giving rise to the claim occurred within the District of Colorado.

## III.  PARTIES

10.    Plaintiff Aditya Prakash is a citizen of India and an international Ph.D. student in the Department of Anthropology at the University of Colorado, Boulder. Mr. Prakash began his studies at the University in the fall of 2022.

11.    Plaintiff Urmi Bhattacheryya is a citizen of India and an international Ph.D. student in the Department of Anthropology at the University of Colorado, Boulder. Ms. Bhattacheryya began her studies at the University in the fall of 2023.

12.    Defendant University of Colorado (the "University" or "CU") is an institution of higher education with its largest campus in Boulder, Colorado. The University of Colorado is governed through its Board of Regents, which is a body established by the Colorado Constitution.

## IV.    STATEMENT OF FACTS

### A.  Plaintiffs Were Accomplished Professionals When They Joined the CU Community

13.    Plaintiffs Aditya Prakash and Urmi Bhattacheryya are accomplished professionals who came to United States from India on student visas to pursue doctoral degrees in cultural anthropology at the University of Colorado, Boulder.

14.    The couple, now engaged, first met in Delhi, India, where they both had burgeoning careers as journalists before choosing to advance their education in the United States.

15.    Mr. Prakash began his doctoral studies at the University in the fall of 2022.

16.     Ms. Bhattacheryya initially began her graduate studies at the University of Southern California (USC) before transferring to CU Boulder in the fall of 2023.

17.     Their decision to pursue their doctoral degrees together at CU represented a significant personal and professional commitment.

18.     With their offers of admission as Ph.D. students in the Department of Anthropology (the "Department"), Plaintiffs received five years (ten semesters) of guaranteed funding which covered tuition costs. With this funding, Ph.D. students were required to be in good academic standing and fulfill a teaching assistantship each semester on campus.

19.     The Department's recommended timeline for using the five years of funding was to use six semesters of the funding for the first three years in the program, typically completing coursework. If on track at the end of the third year, students take a qualifying examination and comprehensive examination (Prospectus Defense), and if successful, become Ph.D. candidates. Students were advised to seek external research funding for the fourth year, where they typically engaged in full-time research off campus. The final four semesters of departmental funding could then be used for their final two years of writing.

20.     According to the Department's Graduate Student Handbook, upon acceptance into the Ph.D. program, each doctoral student was assigned an advisor in their general area of specialization who provided essential guidance in completing degree requirements, including the dissertation.

21.     The Handbook specifies that advisors should provide students with guidance appropriate to their interests and that students are expected to meet with their advisor at minimum once each semester to assess progress toward the degree.

22.     The Handbook states the advisor and student, with advice and approval of the Graduate Committee, select two additional departmental faculty members to serve as the student's core Ph.D. Committee, which should be formed no later than the end of the first year of study.

23.     The core Ph.D. Committee is chosen to provide expertise in the student's area of special interest and has the responsibility to actively guide the student by giving timely advice as to coursework and research direction.

24.     The student's advisor typically serves as chair of their Ph.D. committee and plays a central role in the student's academic progression through the doctoral program. Thus, a thoughtful selection of advisors is critical to success in the program.

25.     During Mr. Prakash's first academic year at the University in 2022-2023, he received exceptional evaluations. At the end of his first academic year, his performance evaluation written by Carla Jones, Director of Graduate Studies and Associate Anthropology Department Chair, highlighted his success in the program. She stated Mr. Prakash "performed beautifully" in his courses and his writing and analytical skills expanded nicely as he deepened his knowledge of the discipline. It noted his professors particularly appreciated his careful reading and effective contributions to class discussions.

26.     Mr. Prakash's evaluation further recognized his performance as a Teaching Assistant as "excellent," and undergraduates were fortunate to have him as part of their college experience.

27.     Mr. Prakash likewise received praise from Kira Hall, Distinguished Professor in the Department of Linguistics and Anthropology, who told Mr. Prakash he was one of the best students she ever had.

28.     By the end of his first year, Mr. Prakash formed a strong advisory committee: Professor Jerry Jacka, who was his assigned advisor; Department Chair Carole McGranahan, who personally requested to serve as co-chair based on Mr. Prakash's scholarly potential; and Professor Jones.

29.     Throughout Mr. Prakash's first year at the University, Ms. Bhattacheryya, who was a graduate student at the University of Southern California, joined for various program events and had numerous one-on-one conversations with Professor Jones to connect over scholarship, while meeting other members of the Department community. Director Jones expressed enthusiastic support for Ms. Bhattacheryya's transfer and became her advisor when she began in the fall of 2023.

30.     Ms. Bhattacheryya likewise excelled upon her transfer to CU, quickly distinguishing herself academically by maintaining a 4.0 GPA while securing highly competitive research funding opportunities.

**B.  A Racial and Ethnic Microaggression and Mr. Prakash's Attempt to Address It**

31.    On September 5, 2023, Mr. Prakash heated his lunch of Palak Paneer in the anthropology department main office microwave, which had been available for use by all department students, staff, and faculty for several years.

32.    As he heated his food, Administrative Assistants Alison Davidson and Renee Kuban entered. Ms. Davidson remarked, "oof, that's pungent." Ms. Davidson stated there was a rule against microwaving foods with strong odors in the main floor microwave. Surprised, Mr. Prakash responded that it was simply food, and "different food is just that—different," and that he would be out in a minute.

33.    Ms. Davidson stated he was lucky that another staff member, Diana Wilson, was not there, implying that if she was, he would not be allowed to heat his food there. Mr. Prakash returned to his desk to eat, feeling othered and saddened.

34.    Seeking to address the situation constructively through direct communication, Mr. Prakash decided to speak with Ms. Davidson in her office. He calmly started to explain how her comment about his food's pungency hurt him. Ms. Davidson interrupted him to call Diana Wilson into the office.

35.    Ms. Wilson told Mr. Prakash that she wanted to keep the office smelling nice, while proceeding to dispose of the trash bag in front of Mr. Prakash, which contained only his empty container of Palak Paneer. When Mr. Prakash asked Ms. Wilson which foods she thought were pungent and which were not, she replied "sandwiches" for not pungent and "curry" for pungent.

36.    Mr. Prakash explained that curry was his entire cuisine, and if pungency was the criterion, asked why beef chili was brought in by Ms. Wilson last year, where it simmered on the stove for three hours. Ms. Wilson paused in reflection as she struggled to answer the question. For the few minutes of conversation, Ms. Wilson and Ms. Kuban defended the rule against strong smelling foods in the main kitchen.

37.    Throughout the short conversation, Mr. Prakash maintained his composure, speaking in a calm and informative manner while maintaining a respectful distance. His demeanor reflected his training as both a journalist and anthropology student, as he approached the conversation as an opportunity for cultural education and understanding, consistent with anthropological principles.

## C.  Students' Solidarity Action and Guest Lecture

38.    On September 7, 2023, Mr. Prakash and four anthropology graduate students used the main office microwave to heat ethnic foods in an act of solidarity.

39.    During this action, the students talked with Ms. Kuban and shared their understanding that there was no policy against graduate students using the main office kitchen. During this conversation, a graduate student expressed to Ms. Kuban that it was a classic microaggression to call someone's ethnic food pungent. Ms. Kuban denied making the statement. The students left after several minutes.

40.    That day, Ms. Bhattacheryya taught two recitation sections as part of her TA responsibilities for an undergraduate anthropology course taught by Professor Jones. The topic was cultural relativism, a foundational concept in anthropology. Cultural relativism teaches the

ways in which various cultures and societies have different ethical and cultural practices and moral codes, and encourages people to see such practices from a factual lens within their cultures and historical contexts, rather than assigning normative judgments from a singular perspective of one's own culture.

41.    Ms. Bhattacheryya invited Mr. Prakash to speak as a guest lecturer to provide students with real-world perspectives on cultural relativism. She followed the department's informal practice where TAs were encouraged to have guest lecturers as a way to engage students and teach the material.

42.    Drawing from his diverse international background, Mr. Prakash described growing up in Rome and attending an international school, where he was made to feel ashamed of his homemade Indian lunches due to the unfamiliar aroma of his cuisine in a foreign land. He also described his experience at university in India, where he mediated conflict between mainland Muslim and Northeastern indigenous students, where religious and cultural practices starkly differed, creating significant tensions between groups. With these and other examples, he illustrated the varied interpretation of moral and normative codes based on one's culture, religion, race, or ethnicity, while demonstrating how cultural relativism can foster cross-cultural understanding and promote inclusivity.

43.    In one recitation, Mr. Prakash provided the example of his recent experience of his Palak Paneer being called pungent in the department without sharing any names of the staff members involved. He encouraged students to consider cultural relativism in the context of

everyday life, encouraging understanding across differences in a manner consistent with the lecture's subject-matter and anthropological pedagogy.

### D. The Department's Response and Kitchen Use Policy Change

44.    On September 12, 2023, Department Chair McGranahan, Professor Jones, and Professor Jacka held a meeting with Mr. Prakash.

45.    Chair McGranahan informed Mr. Prakash that Ms. Davidson and Ms. Kuban had filed a formal complaint with the Office of Student Conduct, reporting they felt "threatened" by Mr. Prakash when he confronted them after the incident occurred.

46.    Chair McGranahan asserted that the policy prohibiting strong-smelling foods was neutral and predated Mr. Prakash, though it had not been enforced since COVID.

47.    Without having heard Mr. Prakash's perspective, McGranahan stated that Mr. Prakash's act of returning with graduate students to use the microwave was an act of escalation, retaliation, and defiance of staff orders.

48.    Professor Jones joined in to express serious concern with Mr. Prakash's capacity to be a successful graduate student if he "could not function professionally" or communicate well with program staff.

49.    Mr. Prakash was shocked by the allegations and the professors' expression of them as truth without having talked to Mr. Prakash. With a calm tone and reasoned demeanor, he attempted to explain the sequence of events and the words exchanged. He explained the impact of Ms. Davidson's comments and the discriminatory history of this microaggression commonly experienced by South Asians.

50.     As Mr. Prakash spoke, Chair McGranahan repeatedly cut him off and defensively stated this had nothing to do with his food being Indian, while claiming there was a separate history at the department of restricting microwave use for foods with strong smells. In response, Mr. Prakash respectfully explained how, while perhaps well-intended, he believed the policy would have a disproportionate and discriminatory impact on ethnic groups like South Asians, considering the subjective nature of what is considered pungent in American culture. Chair McGranahan repeated that the policy was neutral and again cited the policy's history. She asserted the women felt Mr. Prakash was aggressive and violent and he was not to go near them without a third-party present, she pounded the table in agitation when he tried to explain his perspective.

51.     Professor Jones stated Mr. Prakash raising an internal dispute in a recitation was a big problem and demanded he inform her which recitation he spoke to, however it was clear she already knew the answer. Feeling taken aback and uncomfortable by what was transpiring, Mr. Prakash stated he was not comfortable providing that information. He explained he spoke to the topic of cultural relativism and described what he shared.

52.     Professor Jacka recommended that Mr. Prakash take a "crucial conversations" training because they did not believe he addressed the situation properly. Mr. Prakash calmly agreed to do so, while stating he contested this version of events significantly.

53.     At the end of the meeting, Mr. Prakash explained that ethnic students like South Asians will be othered by this policy, and that he had the right to eat lunch and access public

spaces like everyone else. He further shared he felt surprised, deeply saddened, and discriminated against.

54.    On September 13, 2023, Chair McGranahan sent a Department-wide email titled, "Hale Kitchen Use Policy." She stated that historically, the Department frequently asked members of the community to refrain from preparing foods with strong or lingering smells in the main office, with use of the 4th floor main office kitchen for Department members only, and the graduate student lounge kitchen open for all graduate student use. These designations, she stated, had not been enforced since the pandemic, however enforcement would now resume.

55.    Mr. Prakash replied all to the email to explain the incident that precipitated this change, and his perspective on why he believed it was hurtful and discriminatory. He shared that Ms. Davidson and Ms. Kuban remarked that his Palak Paneer was "pungent" when he heated it up in the department microwave and they wanted to keep the office smelling nice. He explained when he tried to address these comments privately with Ms. Davidson, she called in Ms. Wilson into the office, who stated that "curry" was pungent while "sandwiches" were not, while taking out the trash with only his empty food container in it. He explained his act of peaceful protest with four other graduate students by heating ethnic foods in the main office kitchen, and his conversation with Department leaders who informed him he had been reported to the Office of Student Conduct for allegedly threatening staff and was not to be in the main office kitchen without a professor present. He further shared how Indians face food racism in the west with many afraid to open their lunches in community spaces for fear of ridicule and pejorative

comments. He expressed dismay at the Department's response to his attempts to address this issue and his belief that the new policy was discriminatory.

56.     Support for Mr. Prakash from fellow students and faculty was immediate, with a number of individuals expressing shock at the Department's response.

57.     Ms. Wilson emailed Mr. Prakash privately with a sincere apology. She acknowledged she dismissed Mr. Prakash and told him not to be upset, rather than listening to why he was upset. She stated she was truly sorry for hurting him and not listening.

58.     After the department-wide email, Chair McGranahan asked to meet with Ms. Bhattacheryya. Ms. Bhattacheryya responded expressing her concern about the policy and its discriminatory impact, and her disagreement with the Department's treatment towards Mr. Prakash. She stated she would not enter the Hale building or teach recitations until the department took accountability or implemented changes.

59.     The next day, Professor Jones revoked Ms. Bhattacheryya's access to the TA grading and communication platform, effectively terminating her from her TA position without discussion.

**E.  Graduate Student Letter and OIEC Involvement**

60.     On September 15, 2023, a group of 29 anthropology graduate students sent a formal letter to the department describing their concerns with the department's policy, its discriminatory impact, and the Department's treatment of Mr. Prakash and Ms. Bhattacheryya. Among their concerns, they shared their belief that the policy was discriminatory and urged the department to take concrete measures to change policies that reproduce systemic racism.

61.     On or around September 16, 2023, the CU Office of Institutional Equity and Compliance (OIEC) contacted Mr. Prakash and Ms. Bhattacheryya to discuss what occurred. OIEC asked if they wanted to file a formal complaint—Plaintiffs agreed. OIEC opened investigations into the food racism and microaggression claims against Ms. Davidson and Ms. Kuban, and Professor Jones for her removal of Ms. Bhattacheryya from her TA position.

62.     On September 18, 2023, Graduate School Deans Scott Adler and Sarah Jackson contacted Plaintiffs to discuss the situation and attempt to find a resolution. The next week, Plaintiffs shared their demands for resolution to the deans seeking repeal of the food policy, dismissal of the complaint labeling Mr. Prakash a threat, and an apology. Despite their coordination with OIEC encouraging a resolution incorporating these demands, they were not agreed to by the Department.

63.     Regarding Ms. Bhattacheryya's TA removal, on October 4, 2023, Dean Jackson suggested a new TA position for Ms. Bhattacheryya at the Justice, Equity, Diversity and Inclusion Office. Ms. Bhattacheryya started in this role later that month.

64.     On October 22, 2023, the Daily Camera published an article about what occurred after speaking with Plaintiffs about their experience.

65.     Throughout the month October, OIEC proposed an informal resolution process short of investigation with a suggestion to have compliance dialogues with McGranahan, Jacka, Jones, Davidson, and Kubik, along with a training for the Department – these suggestions were not yet proposed to or agreed upon by these individuals. Alternatively, Plaintiffs could request formal investigation, and if OIEC found enough evidence to bring allegations after fact-finding,

respondents would be notified and an investigation would occur. After a number of conversations between Plaintiffs and OIEC, OIEC moved forward with an investigation.

66.     On November 9, 2023, OIEC sent a Notice of Allegations to Ms. Kuban and Ms. Davidson regarding the food incident with Mr. Prakash, and a Notice of Allegations to Professor Jones regarding the removal of Ms. Bhattacheryya from her TA role.

67.     With no communication from or support from their advisors, Mr. Prakash and Ms. Bhattacheryya sought support for grant applications and recommendations through other Department Professors they completed course with, like Donna Goldstein and Kira Hall, who happily agreed to assist.

### F. Complete Resignations of Plaintiffs' Ph.D. Advisors and Committees

68.     On January 10, 2024, Mr. Prakash and Ms. Bhattacheryya received letters from Chair McGranahan stating their entire Ph.D. committee members would no longer be advising them, effective immediately. No explanation was provided, nor any warning given. Plaintiffs were told their new advisors would be Anthropology Professors Gerardo Gutierrez, an archeologist, and Matthew Sponheimer, a biological anthropologist. Without any information or choice in the matter, they were assigned new advisors completely outside of their subdisciplines.

69.     Plaintiffs were extremely concerned. They notified OIEC and Graduate Deans Adler and Jackson about this change. Plaintiffs further informed OIEC and the Deans that nothing had changed within the department since the incident, with no apology, acknowledgment, or communication from their former advisors aside from McGranahan's letter.

70.     Mr. Prakash and Ms. Bhattacheryya turned to their newly assigned advisors, Professors Gutierrez and Sponheimer, for guidance. Professor Sponheimer was largely absent from their interactions and unresponsive to their emails, while Professor Gutierrez, though more accessible, showed little interest in their academic development.

71.     In their efforts to find additional committee members, Plaintiffs diligently contacted other Department professors with overlapping scholarly interests who were familiar with their work and research interests. They worked with persistence and flexibly to find ways to shift their research focuses for greater alignment. They also contacted professors at other institutions considering the highly specialized nature of anthropology scholarship.

72.     With indifferent advisors outside of their subdisciplines, Plaintiffs spent significant amounts of time submitting their own grant applications, adjusting their research, searching for additional committee members, and obtaining guidance through other professors.

73.     Despite these obstacles, both students continued to excel in their coursework, maintained 4.0 GPAs, successfully secured new committee members, submitted pre-candidacy applications, and received competitive research funding, despite not having meaningful or any guidance from their own advisors.

74.     In March of 2024, Ms. Bhattacheryya and Mr. Prakash emailed advisors Gutierrez and Sponheimer regarding their pre-candidacy worksheets, recommendation letters, and coursework completion. Ms. Bhattacheryya also described her plan to apply to the Graduate Committee for the transfer of her credits from USC's doctoral program, which she was repeatedly assured by Professor Jones that such credits would transfer, even prior to her

admittance at CU. As is customary of the advisor-advisee relationship, she requested their support for her transfer request, which required advisor approval. Professor Gutierrez agreed to support her credit transfer application.

75.     Mr. Prakash discussed with advisor Gutierrez his request for a credit transfer from Linguistic Anthropology with Professor Hall with a request to take the course a second time, with both to count as 7000 level cultural anthropology seminars. First, Linguistic Anthropology was a seminar level course, was central to his project, and was the best and most appropriate way to do interdisciplinary projects between different subfields (cultural and linguistic anthropology). He requested Professor Gutierrez's support in emphasizing the fact that he needed to change his project to match the expertise of the faculty who agreed to be on his committee (Professor Hall) and expanded the focus due to the mentorship he needed after his committee resigned. Professor Hall provided a letter of support explaining the foregoing. She had successfully done this in the past for other students, and Professor Gutierrez stated he would support Mr. Prakash's request.

### G. Negative Performance Evaluations and Downgraded Student Status

76.     On May 6, 2024, OIEC sent a Notice of Allegations to McGranahan, Jones, and Jacka regarding their retaliatory resignations from Mr. Prakash's and Ms. Bhattacheryya's committees.

77.     On June 4, 2024, OIEC sent amended notices of allegations to McGranahan, Jones, and Jacka that encompassed additional information they received from Plaintiffs.

78.    That same day, both Mr. Prakash and Ms. Bhattacheryya received negative feedback in their annual evaluations from Professor Jones, with their teaching performance described as "uneven."

79.    Both Plaintiffs' feedback stated in nearly identical wording that Anthropology Professor Christian Hammons, for whom both served as teaching assistants (TAs), found Plaintiffs either did not provide enough feedback and their grading style was terse, unclear, or harsh. It also noted they missed half of the class sessions they were expected to attend.

80.    Professor Hammons teaches the undergraduate course, "Exploring Culture and Gender Through Film." His policy for TA attendance was a minimum of two TAs be present for each lecture, which the TAs were to coordinate amongst themselves. He required attendance for half of his lectures—a requirement that Mr. Prakash and Ms. Bhattacheryya consistently fulfilled.

81.    While Ms. Bhattacheryya was considered to still be making adequate progress towards her degree, the same was not found for Mr. Prakash, who was deemed "no longer making adequate progress toward his degree." As a result, Mr. Prakash's student status was downgraded, placing him in academic jeopardy and making him ineligible for program resources, including professional development funds, pre-dissertation funding, and scholarships.

## H. Denial of Credit Transfers and Defendant's Continued Obstacles to Plaintiffs' Success

82.    On September 3, 2024, Ms. Bhattacheryya sent an update to Dean Jackson detailing the escalating retaliation, including Mr. Prakash's downgraded status and suggestions from advisors that they should take Terminal Master's degrees and leave the program.

83.    On September 18, 2024, Deans Jackson and Adler acknowledged in a Zoom meeting that the food incident was racism and that retaliation had occurred.

84.    The deans initially stated they would support transfers and help move funding, but when Plaintiffs applied to CU's Geography and Critical Media Practices PhD programs as an effort to leave their current programs considering everything that had transpired, the deans reversed course, claiming they had no role in the admissions process. Plaintiffs' applications to these programs were denied.

### I. Denial of Credit Transfers

85.    On November 14, 2024, Mr. Prakash sent all necessary forms, information, and Professor Hall's letter of support to advisor Gutierrez to submit his application for the linguistic anthropology credit transfer, along with requesting Gutierrez's letter of support, as agreed upon months prior.

86.    On January 22, 2025, Mr. Prakash followed up with advisors Gutierrez and Sponheimer after receiving notice that his credit transfer application was never received. Mr. Prakash discovered Professor Gutierrez failed to forward his request to the Graduate Committee, despite Professor Kira Hall's explicit endorsement.

87.    When Mr. Prakash followed up with Professor Gutierrez, Gutierrez accused him of being "imperious" and stated it was his responsibility to monitor all paperwork.

88.    Director of Graduate Studies Doug Bamforth denied Mr. Prakash's credit transfer request, erroneously claiming that university rules prohibited taking Professor Hall's course twice for credit, despite Professor Hall's established practice of allowing this.

89.     Ms. Bhattacheryya's credit transfer petition for her USC credits was likewise rejected by Director Bamforth in December 2024, despite prior repeated assurances from Professor Jones that the credits would be accepted as core courses.

### J.   Revocation of Plaintiffs' Funding and Current Status

90.     In their June 2025 performance letters, both Mr. Prakash and Ms. Bhattacheryya were told they were not making sufficient academic progress toward their degrees and were no longer eligible for teaching assistantships. Defendant again cited their "poor performance" as TAs in Professor Hammons' course, and their lack of completion of certain course requirements.

91.     Plaintiffs have continued to maintain 4.0 GPAs, obtain extremely competitive research grants, passed their thesis defense, and have a sufficient number of credits completed.

92.     However, without advisor support, the Department continues to block Plaintiffs' ability to complete program requirements through denying them credit and course transfers under the circumstances, providing highly inadequate advice, and no support. The Department denied these transfers despite approval and support from Professors Hall and Goldstein, who successfully supported these transfers for other students in the past.

93.     In addition, the revocation of teaching assistantships revoked Plaintiffs' doctoral funding for the remainder of their program.

94.     As international visa student-holders, Plaintiffs must maintain enrollment in at least 6 credit hours each semester to maintain their visa status. With funding revoked, Plaintiffs faced approximately $30,000 in tuition costs for the fall 2025 semester alone, with payment due by September 6, 2025.

95.     Considering Plaintiffs have not been able to timely progress in their doctoral track and this academic year would have been the equivalent of their fourth year in the program, which is typically spent doing field research off-campus, it made little sense for them to pay $30,000 out of pocket to take courses they do not need in order to maintain their visa status and stay in the country. Plaintiffs thus recently elected to apply for a leave of absence for the current semester (fall 2025).

96.     As a direct result of Defendant's discriminatory and retaliatory conduct, Plaintiffs have suffered substantial economic damages, including but not limited to loss of guaranteed doctoral funding, additional tuition and fee costs due to delayed academic progression caused by Defendant's obstruction, lost opportunities and professional development funding due to their downgraded academic status, diminished future earning capacity resulting from the interruption and potential termination of their doctoral studies; costs associated with seeking alternative educational arrangements and attempts to transfer; out-of-pocket expenses for academic materials, research, and professional development that would have been covered by their funding; and lost TA stipend income from teaching assistantships totaling approximately $20,000 per academic.

97.     Furthermore, the discriminatory treatment and ongoing retaliation have caused Plaintiffs emotional distress, mental anguish, and pain and suffering. Plaintiffs have suffered from feelings of isolation, frustration, anger, and humiliation. Mr. Prakash has experienced profound disappointment and disillusionment after joining what he believed would be a supportive academic environment, only to face retaliation for advocating against racial

microaggressions. Ms. Bhattacheryya has experienced painful flare-ups of her fibromyalgia condition, which have been exacerbated by the chronic stress of navigating academic obstacles and discriminatory treatment imposed by Defendant.

98.    As international students who relocated across the world relying on promises of academic mentorship and support, Plaintiffs have experienced emotional harm from the betrayal of trust by their academic institution, especially within a field that studies and supports cultural inclusion of all kinds.

99.    The uncertainty regarding their academic future and immigration status has caused ongoing psychological distress and affected their ability to plan for their professional and personal lives.

100.    Both Plaintiffs have suffered reputational harm within their academic field due to the University's characterization of their legitimate concerns as threatening behavior and their subsequent academic difficulties. In addition, the negative performance evaluations, despite their exemplary academic records, have damaged their professional standing and future career prospects in academia. And the downgrading of their student status has made them ineligible for numerous professional opportunities and funding.

101.    The discriminatory treatment continues to cause irreparable harm to Plaintiffs' academic trajectories and professional futures.

102.    Without resolution of these claims, Plaintiffs face the prospect of being unable to complete their doctoral degrees, representing years lost of academic investment and career preparation.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
Retaliation
Title VI of the Civil Rights Act of 1964
42 U.S.C. §§ 2000d

103.    Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

104.    Plaintiffs are members of a protected class based on their race, ethnicity, and national origin as individuals from India.

105.    Plaintiffs engaged in protected activity under Title VI when they complained about discrimination based on race, ethnicity, and national origin directly to the staff members involved in the initial encounter, with their initial advisors and committees, to the department, Graduate Deans, and OIEC.

106.    Defendant subjected Plaintiffs to adverse actions in response to, and because of their protected activities, including the removal of Ms. Bhattacheryya from her TA position, coordinated resignations of their advisory committees, reassignment to advisors outside of their subdisciplines, lack of advisory support, denial of credit transfers, downgrading student status, revoking their eligibility for teaching assistantships, and the revocation of program funding.

107.    There is a causal connection between Plaintiffs' protected activity and the adverse actions.

108.    The University knew of the discrimination and retaliation but failed to adequately respond.

109.    As a direct and proximate result of Defendants' violations, Plaintiffs have suffered significant damages.

## SECOND CLAIM FOR RELIEF
Free Speech Retaliation,
First Amendment of the U.S. Constitution
42 .S.C. § 1983

110.    Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

111.    Plaintiffs engaged in protected speech pursuant to the First Amendment when they objected to what they reasonably perceived as racial and ethnic microaggressions and advocated against discriminatory treatment.

112.    Plaintiffs' communications through emails and in-person discussions were made as concerned citizens and students addressing matters of public concern.

113.    Mr. Prakash engaged in constitutionally protected speech and conduct when he engaged in an act of solidarity with other graduate students and spoke during Ms. Bhattacheryya's recitation, where he connected personal experiences to the lecture topic of cultural relativism.

114.    Following these protected activities, Defendant took adverse actions, including the removal of Ms. Bhattacheryya from her TA position, coordinated resignations of their advisory committees, reassignment to advisors outside of their subdisciplines, lack of advisory support, denial of credit transfers, downgrading student status, revoking their eligibility for teaching assistantships, and the revocation of program funding.

115.    These adverse actions would chill a person of ordinary firmness from continuing to engage in protected activity.

116.    There is a causal connection between Plaintiffs' protected speech and Defendants' adverse actions. Defendant took these actions in response to, and because of Plaintiffs' protected speech and conduct.

117.    There is no legitimate pedagogical interest of Defendant that justifies these retaliatory actions.

118.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered significant economic, physical, mental, and emotional damages.

**THIRD CLAIM FOR RELIEF**
Free Speech Retaliation
Colorado Constitution Article II, Section 10
C.R.S. § 13-21-131

119.    Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

120.    Plaintiffs engaged in protected speech pursuant to the Colorado Constitution when they objected to what they reasonably perceived as racial and ethnic microaggressions and advocated against discriminatory treatment.

121.    Plaintiffs' communications through emails and in-person discussions were made as concerned citizens and students addressing matters of public concern.

122.    Mr. Prakash engaged in constitutionally protected speech and conduct when he engaged in an act of solidarity with other graduate students and spoke during Ms.

Bhattacheryya's recitation, where he connected personal experiences to the lecture topic of cultural relativism.

123.    Following these protected activities, Defendant took adverse actions, including the removal of Ms. Bhattacheryya from her TA position, coordinated resignations of their advisory committees, reassignment to advisors outside of their subdisciplines, lack of advisory support, denial of credit transfers, downgrading student status, revoking their eligibility for teaching assistantships, and the revocation of program funding.

124.    These adverse actions would chill a person of ordinary firmness from continuing to engage in protected activity.

125.    There is a causal connection between Plaintiffs' protected speech and Defendants' adverse actions. Defendant took these actions in response to, and because of Plaintiffs' protected speech and conduct.

126.    There is no legitimate pedagogical interest of Defendant that justifies these retaliatory actions.

127.    As a direct and proximate result of Defendant's actions, Plaintiffs have suffered significant economic, physical, mental, and emotional damages.

**FOURTH CLAIM FOR RELIEF**
**Retaliation in Violation of 42 U.S.C. § 1981**
**42 .S.C. § 1983**

128.    Plaintiffs incorporate all paragraphs of this Complaint as though fully set forth herein.

129.    Plaintiffs are members of a protected class based on their race and ethnicity.

130.    Plaintiffs had contractual relationships with the University encompassing their enrollment as doctoral students and employment as teaching assistants. These included their admission agreements guaranteeing five years of funded support contingent on making sufficient academic progress each year, their teaching assistantship agreements providing stipends and tuition coverage, and student policies of fair and non-discriminatory treatment in their academic programs.

131.    Plaintiffs engaged in protected activity when they opposed discrimination prohibited by Section 1981, including when they opposed racially discriminatory treatment with members of the Department, submitted OIEC complaints, and complained to the Graduate School Deans.

132.    Defendants retaliated against Plaintiffs by impairing their ability to make and enforce contracts on equal terms with white individuals through removing Ms. Bhattacheryya from her TA position, coordinating the complete resignations of their advisory committees, reassigning advisors outside of their subdisciplines, lack of advisory support, denying credit transfers, downgrading student status, revoking their eligibility for teaching assistantships, and the revocation of program funding.

133.    Defendants' retaliatory actions deprived Plaintiffs of the same right to make and enforce contracts enjoyed by white citizens. White students in the anthropology program were not subjected to coordinated committee resignations, arbitrary advisor reassignments, or funding revocation for expressing concerns about discriminatory treatment.

134.     Defendant's actions interfered with Plaintiffs' existing contractual relationships and their ability to form new academic and professional relationships within the University community.

135.     Plaintiffs' continued opposition to their racially discriminatory treatment was the direct and proximate cause of Defendants' retaliatory actions.

136.     As a direct and proximate result of Defendant's violations, Plaintiffs have suffered substantial damages including loss of contractual benefits, diminished academic and professional opportunities, economic harm, and emotional distress.

### VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in their favor and against Defendant, and award them all relief as allowed by law, including, but not limited to:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.   Pre-judgment and post-judgment interest at the highest lawful rate;

e.   An award of punitive damages because Defendant engaged in intentional discrimination and has so done with malice or reckless indifference to Plaintiff's federally protected rights;

f.   Attorney's fees and costs; and

g.   Such further relief as justice requires.

**PLAINTIFFS HEREBY DEMAND TRIAL BY JURY PURUSANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(b) ON ALL ISSUES SO TRIABLE.**

Dated this 5th day of September, 2025.

TYRONE GLOVER LAW, LLC

*s/ Helen Oh*
Helen Oh
Tyrone Glover
Genevieve Mesch
2590 Walnut Street
Denver, CO 80205
303-577-1655
helen@tyroneglover.com
tyrone@tyroneglover.com
genevieve@tyroneglover.com

*Attorneys for Plaintiff*